WESTERN CASUALTY & SURETY COMPANY *v.* LINEBARGER.

4-9434                                      239 S. W. 2d 753

Opinion delivered May 21, 1951.

Rehearing denied June 18, 1951.

*Wright, Harrison, Lindsey & Upton, Charles R. Leick* and *Barber, Henry & Thurman,* for appellant.

*E. Charles Eichenbaum* and *A. F. House,* for appellee.

ROBINSON, J. The appellee, Linebarger, was the principal contractor in the construction of the Rivercliff Apartments, consisting of several large apartment buildings, the contract price being $1,140,870 cash plus 565

shares of the common capital stock of the owner. Floyd D. Cart entered into a contract with Linebarger whereby Cart, for a stipulated consideration per square yard according to the method of plastering used, agreed to do the plastering on the job, and made a performance bond with the Western Casualty & Surety Company as surety. After Cart had done considerable work and had been paid $33,500 by Linebarger, Cart breached his contract by abandoning the project. Linebarger called on the surety to carry out the contract which the surety refused to do. Linebarger then employed another sub-contractor to do the job, and after the work was completed, filed suit against Cart for breach of contract and claimed damages in the sum of $36,491.73. The surety Company was made a party defendant.

Cart answered denying he was indebted to Linebarger in any amount and, by way of cross-complaint, alleged that Linebarger was in fact indebted to him in the sum of $5,737.26. The Western Casualty & Surety Company adopted the answer of Cart, and also contends that it is not liable for the following reasons:

"(1) Failure of Linebarger to pay on monthly estimates in accordance with the provisions of the contract.

"(2) Failure of Linebarger to withhold 10% retainage in accordance with the provisions of the contract.

"(3) Substantial and material changes made in the contract and specifications by Linebarger without notices to Surety."

The Chancellor made a finding that Cart was indebted to Linebarger in the sum of $33,201.78, and that Cart was entitled to credits against that sum in the amount of $9,058.67, and rendered a judgment in favor of Linebarger against Cart in the sum of $24,143.11.

It was the further finding of the court that the Surety Company, insofar as the corrective work was concerned, was only liable for 33 and 1/3 per cent of the cost thereof, and gave judgment against the surety Company in the sum of $16,222.60.

There was considerable evidence introduced in the case by both sides, and to set out here an abstract of the testimony showing just how the Chancellor arrived at his finding would unduly extend this opinion and would serve no useful purpose.

The parties hereto do not disagree as to the law governing this case, but there is a sharp disagreement with reference to the facts. The contract provides: "It is agreed and understood between the parties hereto that the party of the first part (Cart) agrees to accept, and the party of the second part (Linebarger) agrees to pay for the work performed on the basis of monthly estimates prepared by the party of the first part and checked for quantity and performance by the party of the second part."

Appellants contend that the evidence is clear and convincing that Linebarger did not require the monthly estimates and check them for quantity and quality. On the other hand, the appellees introduced evidence to prove that the monthly estimates were required and checked. Appellants also contend that Linebarger did not retain 10% in accordance with the terms of the contract and evidence was introduced tending to show that 10% was not retained. However, Linebarger introduced evidence to the contrary.

Appellants next claim that there were substantial and material changes in the contract without notice to the surety. Appellees say there has been no change in the contract. In this respect the surety Company asserts that the contract calls for a gross consideration to be paid Cart of $62,551.70. But, the contract specifically provides for payment on a unit basis. The contract mentions the number of square yards of several different methods of plastering and the price per square yard of each method, and then the contract provides: "It is further understood and agreed that the quantities set forth above are of close approximation only and that the unit prices govern." The total price on the unit basis came to $50,884.34. In view of the provision of the contract as to the unit price governing, it cannot be said

that there was a change in the contract in this respect. The prime contract by reference was made part of the contract between Cart and Linebarger. Article 15 of the prime contract is as follows:

"Art. 15. Change in the Work.—The owner, without invalidating the Contract, may order extra work or make changes by altering, adding to or deducting from the work, the Contract Sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

"In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the architect, or a written order from the architect stating that the owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

"The value of any such extra work or change shall be determined in one or more of the following ways:

"(a) By estimate and acceptance in a lump sum.

"(b) By unit prices named in the contract or subsequently agreed upon.

"(c) By cost and percentage or by cost and a fixed fee."

In the case at bar the architect was also the principal owner. He authorized and directed smooth finish of the plaster, instead of sand finish, in the bathrooms and kitchens, for which Cart was allowed additional compensation. A change of 1700 square yards of plastering from rock lath walls to metal lath walls was also authorized and directed by the architect owner, and the surety

52

Company now claims that this change voided the bond, but the Chancellor found that the items above mentioned were such changes as were anticipated by Article 15 of the prime contract.

The last and what we think is the most serious contention made by appellants is that the contract called for the use of "Knapp-mold" at the points where the plaster joined the concrete, the purpose of this mold being to prevent the plaster from cracking due to the difference in the expansion and contraction quality of the materials. This mold could not be readily obtained at the time and, at a conference between Cart, Linebarger and the architect-owner, Cart stated that he had been doing plaster work for a long time and that he could make a V-joint which would serve the same purpose as the "Knapp-mold". The parties agreed to the V-joint, but Cart did not make the V-joint. He plastered flush with the concrete and as a result the plaster cracked.

Several experts in building-construction testified that the change from "Knapp-mold" to a V-joint would not be a material change in the plans. Furthermore, insofar as the corrective work is concerned, the trial court held the surety Company liable for only one-third of the cost thereof. On cross-appeal appellees contend that the trial court erred in not holding the surety Company liable for the entire cost of the corrective work.

After considering all the facts in the case, we cannot say that the Chancellor's findings are contrary to the preponderance of the evidence.

Affirmed on both appeal and cross-appeal.

GEORGE ROSE SMITH, J., not participating.

PAUL WARD, J., dissents.